## LEATHE v. TITLE GUARANTY TRUST CO.*

(Circuit Court of Appeals, Eighth Circuit. February 28, 1927.)

No. 7508.

**1. Appeal and error ⟨⟩1022(1)—Findings of special master, approved by chancellor, may be set aside for obvious error in law, or in** *considering evidence, or if against clear* **weight of evidence.**

Though findings of a special master approved by the chancellor will ordinarily not be set aside by appellate court, if master's findings were caused by an obvious error in applying the law, or serious mistake in considering evidence or are clearly against the weight of evidence, appellate court may set them aside.

**2. Trusts ⟨⟩191(1)—Agreement under which plaintiff conveyed realty to trust company guaranteeing title held to authorize trust company to sell property.**

Agreement under which plaintiff conveyed realty to trust company in consideration of its guaranteeing title of realty acquired by plaintiff under her deceased husband's will to indemnify it against loss, and authorizing it to sell sufficient realty to satisfy large judgment against husband's estate and other charges, *held* to authorize trust company to sell realty to pay such judgment, as against contention that it was volunteer or meddler in doing so, and fact that judgment was assigned to one of trust company's officers was immaterial.

**3. Trusts ⟨⟩187—Trust company to which** *plaintiff conveyed realty in consideration for* **its guaranteeing title held not required to pay judgment against plaintiff without request.**

Where plaintiff conveyed realty to trust company in consideration of its agreement to guarantee title of realty sold by plaintiff acquired by her under her deceased husband's

will, a large judgment having been rendered against husband's estate, any property remaining unsold to be reconveyed to plaintiff, *held,* that it was not trust company's duty as trustee to pay off another judgment against plaintiff to prevent judgment sale of plaintiff's realty without request from plaintiff to do so and offer to secure trust company for the advancement.

**4. Trusts ⟨⟩231(3)—Trustee may purchase beneficiary's property to protect interests of trust.**

Rule that court of equity will not permit trustee to purchase property of beneficiary under a paramount title does not apply where purchase is made by trustee to protect interest of trust, including its own interests, and is not for personal gain of trustee nor adverse to beneficiary.

**5. Trusts ⟨⟩231(3)—Facts held to show trust company purchased beneficiary's realty about to be sold under foreclosure in trust for beneficiary.**

That trust company, which purchased property about to be sold under mortgage foreclosure and belonging to beneficiary of trust of which it was trustee, charged purchase price and other expenditures in connection with purchase to beneficiary's account on dates of payments and rendered complete statements of account to beneficiary's attorneys, *held* to show that it acquired title in trust for beneficiary and not for its own use, and that title was taken in name of its employee for convenience only.

**6. Trusts ⟨⟩225—That trust company guaranteed plaintiff's title in amount greater than cash received after selling stock taken in part payment held not improper.**

That trust company under its agreement to guarantee title to plaintiff's realty, against which large judgment had been rendered, guaranteed title in sum of $415,000 on realty sold for $500,000, and charged therefor and paid commissions on sale accordingly instead of on basis of what plaintiff actually received after stock taken in part payment was sold, *held* not prejudicial to plaintiff, since purchaser had right to demand guaranty on entire purchase price.

**7. Trusts ⟨⟩231(1)—That brokers who sold plaintiff's property held in trust divided commissions with broker, who was officer of trustee, held not improper.**

That brokers who sold plaintiff's property held in trust by trust company divided commissions received with another broker, who was also a director of trust company, *held* not improper and did not prejudice plaintiff.

**8. Account stated ⟨⟩6(2)—Failure to object to statement showing price received, charges for guaranteeing title, and brokers' commissions, held to make account stated.**

Failure to object to statement of trust company showing price received on sale of realty held in trust and charges for guaranteeing title and brokers' commissions, within reasonable time after receipt thereof, made it an account stated, and estopped recipient from denying liability for charges contained therein, whether he was actually liable for them or not.

*Rehearing denied May 6, 1927. Motion for stay of mandate filed May 16, 1927.

**9. Trusts ⚖⇒325—That trust company to which plaintiff conveyed realty to indemnify it against loss under its guaranty of title violated duties as trustee held not proved.**

In suit for accounting against trust company as trustee of realty conveyed to it by plaintiff in consideration of its agreement to guarantee title of plaintiff's realty, acquired under will of her deceased husband and against which a large judgment had been rendered, evidence *held* not to show that trust company failed to discharge its duties as trustee.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit by Grace A. Leathe against the Title Guaranty Trust Company. Decree for defendant, and plaintiff appeals. Affirmed.

S. Mayner Wallace and Henry S. Priest, both of St. Louis, Mo. (Robert E. Moloney, of St. Louis, Mo., and L. O. Williams, of Clinton, Ill., on the brief), for appellant.

Earl F. Nelson and Xenophon P. Wilfley, both of St. Louis, Mo. (Fred L. Williams, of St. Louis, Mo., on the brief), for appellee.

Before LEWIS and KENYON, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The parties will be referred to as they appeared in the court below, the appellant as plaintiff and the appellee as defendant.

The action was instituted by the plaintiff for an accounting, claiming a very large sum of money, amounting to about $1,000,000, to be due her from the defendant.

The facts alleged in the complaint, briefly stated, are:

That Samuel H. Leathe departed this life in 1907, and by his will devised a large amount of real estate to the plaintiff, his widow, and also appointed her as executrix under the will. At the time of his death, one Charles H. Knisely was asserting a large claim against the deceased, which had been for some time in the courts prior to Mr. Leathe's death, and which, on July 2, 1915, became a judgment in the circuit court of St. Louis, amounting to the sum of $192,263.75, which judgment became a lien on the greater part of said real estate devised to the plaintiff, including most of the parcels involved in this action.

On April 7, 1914 (in anticipation of this judgment, by the circuit court, the Supreme Court of the State having finally disposed of the case in favor of Knisely, 256 Mo. 341, 166 S. W. 257, leaving only the amount to be determined by the circuit court), the plaintiff entered into a contract in writing

with the defendant, where, in consideration of defendant agreeing to guarantee title to all or part of said estate, notwithstanding the said Knisely claim, she agreed, for the purpose of protecting defendant against liability on any guarantees of title defendant might issue, to convey to defendant by warranty deed, and the defendant agreed to hold upon the terms in the contract set forth, certain parcels of land:

Parcel 1. A lot on the south side of Washington avenue and Nineteenth street, on which there was an incumbrance of $75,000.

Parcel 2. A lot on the north side of Washington avenue and Nineteenth street, subject to an incumbrance of $50,000.

Parcel 3. A block on the north line of Washington avenue, bounded by Twentieth and Twenty-First streets, subject to a first mortgage for $215,000, of which $50,000 had been paid, and a second mortgage for $100,000, on which $60,000 had been paid.

Parcel 4. A block on the south side of Washington avenue and Eighteenth street, subject to a first mortgage for $150,000, and a second mortgage for a balance of $50,000.

It then sets out some of the provisions in the contract.

That on or about May 19, 1915, the defendant, assuming to act under the provisions of said contract, sold to one Paul Brown the premises described in parcels 1 and 4 for a consideration of $500,000; $225,000 of the purchase money was the assumption by Brown of the mortgages on the property, $100,000 less certain expenses connected with the conveyance was paid in money, and 1,225 shares of the capital stock of the Clayton Road Realty Company were accepted at an agreed valuation of $175,000.

The plaintiff accepted the 1,225 shares of stock at an agreed valuation of $175,000 without any investigation and solely upon the faith in the representations of the defendant in regard to their value.

In May, 1914, plaintiff had caused to be incorporated the Leathe Estate Investment Company, for the purpose of taking title to, holding, and selling parts of the real estate so devised to her, and for said purpose she conveyed to the said investment company certain parcels of the real estate; that in fact she is and at all times has been the sole beneficial owner of said investment company.

On May 29, 1915, after the sale of parcels Nos. 1 and 4, to Mr. Brown, and pursuant to the terms of another contract entered into that day by the investment company and the defendant, she caused the in-

vestment company, because of defendant's wrongful refusal to execute certain guarantees of title, as had been agreed upon, to convey by warranty deed, subject to the provisions in the agreement of April 7, 1914, three additional parcels of real estate, described as parcels 5, 6, and 7. Parcel 5 is a lot of 50 feet on the south line of Washington avenue, near Twentieth street. Parcels 6 and 7 conveyed a large tract on Poplar street. These parcels were subject to a first deed of trust for $215,000, and a balance of $50,000 on a second deed of trust, and a later deed of trust given as additional security to secure a principal note of $50,000.

That the defendant sold parcels 6 and 7 (which will be referred to as the Poplar street property) to Harrison B. Riley and William C. Niblack of Chicago, for a cash consideration of $300,000, and has advised the plaintiff that, out of the said consideration, it has paid on plaintiff's account divers sums of money for commissions, guarantees of title and interest charges, and other sums, including the sum of $175,000 made in payment of the several deeds of trust on said property, and that the total amount of unpaid incumbrance on all of the property conveyed to defendant and held by it, had been reduced from the proceeds of the sale to the sum of $140,000, and that defendant then had cash on hand for plaintiff's account $116,892.84.

On August 10, 1916, the trustee of the mortgages on parcels 2, 3, and 5 advertised them for sale by reason of a default in the payment of the debt as it matured, and at said sale they were bought by one Thomas J. Sheridan for a consideration of $147,850; that Sheridan at the time was an employee of the defendant and acting for its sole use and benefit; that on April 9, 1919, said Sheridan conveyed said parcels to one Thos. F. Stevens, also an officer and employee of said defendant, for a recited consideration of $1.

On October 13, 1916, the defendant pretending to act under the agreement between it and the plaintiff advertised and sold to said Thomas J. Sheridan, one of its employees, the 1,225 shares of stock taken in part payment of the sale to Brown, for the sum of $10,000, and in the manner set forth has appropriated all of said property of the plaintiff conveyed to it in trust.

It is further alleged that, in February, 1920, the defendant sold and disposed to persons unknown to plaintiff, said shares at approximately the sum of $91,000, and that the defendant at the time of said sale to Paul Brown, and the acceptance of said stock as part of the consideration for the conveyance, either grossly misrepresented the value of said stock to the plaintiff, or else has been guilty of gross negligence in violation of its duty as plaintiff's trustee, and therefore defendant should account to plaintiff for the difference between the sum of ten thousand dollars and $175,000, the agreed value thereof at the time it was accepted by it from said Brown.

That during July, 1918, the defendant purchased the said Knisely judgment and caused the same to be assigned to one H. H. Hopkins, an agent for and officer of defendant, as trustee, and said judgment yet appears of record as in full force and effect against plaintiff as executrix of her deceased husband.

That parcels 6 and 7 referred to as the Poplar street property were very valuable, and worth at least $500,000 more than the amount reported to have been realized by defendant ($300,000), and that defendant should be compelled to account to plaintiff for at least $500,000.

That parcels 2, 3, and 5, situated on Washington avenue, were at the time they were purchased by defendant, and the title taken in the name of Sheridan, its employee, worth far in excess of the amounts which Sheridan paid therefor; that the value is at least $507,972.22, and therefore the defendant should account to the plaintiff for the difference amounting to $367,972.22.

That defendant, although repeatedly requested, has refused and yet refuses to render to plaintiff a full and complete and satisfactory account or statement of its trusteeship.

That at no time since the consummation of the transaction with said Paul Brown, in 1915, has plaintiff been consulted by the defendant as to the handling or disposition of any of said properties, or the administration of the trusteeship, but on the contrary it has handled and disposed of said property as if the same had been its absolute property, and has been antagonistic to her interests.

It is further alleged that after the conveyance of parcels 5, 6, and 7, the investment company became inactive and dispossessed of all its assets, and, on the 2d day of December, 1916, plaintiff had no further need or use for the continued existence of said company as a corporation, and its charter and its corporate rights and privileges were forfeited under the laws of the state of Missouri.

The prayer is for an accounting, and for a decree for such amounts as may be found to be due.

The amended answer, on which the cause was heard, also contained a counterclaim, in which it asked for a decree of foreclosure.

The amended answer admits the execution of the agreements as charged in the complaint; denies that it accepted the 1,225 shares of stock, set out in the complaint, at the valuation of $175,000 on its own responsibility, but on the contrary it alleges that it had refused to accept them, but at the request and instruction of the plaintiff, and her agents and attorneys, it did accept the same at the valuation of $175,000; that after the sale it did not consider the property remaining was of sufficient value to secure it under said contract, and it therefore required plaintiff, as a condition to its consenting to said sale that the plaintiff or her successor the investment company, convey other property as additional security for the liabilities assumed by it under their agreement of 1914, and thereupon on May 29, 1915, the investment company did convey the realty set out in the complaint as parcels 5, 6, and 7; that the said property was subject to a first deed of trust for $215,000 maturing May 20, 1916, and interest thereon, to a second deed of trust for $50,000, and a third deed of trust for $50,000 and interest thereon, and held the same under the agreements of April 7, 1914, and that of May 29, 1915.

That in accordance with the opinion and judgment of the Supreme Court in Knisely v. Leathe,[1] judgment was entered thereon on July 2, 1915, in the circuit court of St. Louis in favor of Knisely's executrix for $192,263.75, which judgment was certified to the probate court, and which court, on writ of mandamus from the circuit court, classified said judgment as a claim against the estate of Samuel H. Leathe, and thereafter directed a sale of sufficient real estate of the estate for the purpose of satisfying said judgment.

It denies that the consideration realized for the Poplar street property was less than its value; or that it was unnecessary or wrongful to sell the same, but that $300,000 was a fair and reasonable price therefor; that it paid $188,978.20 on account of deeds of trust, interest, commissions, revenue stamps, guaranty of title, leaving a balance of $111,021.80.

Regarding parcels 2, 3, and 5, it alleges that they were offered for sale by the Mortgage Trust Company, the owner of the deed of trust, under the powers of the deed of trust, default in the payment of the debt secured thereby having been made, and bought it for the indebtedness due thereon; that the title thereto was taken in the name of Thomas J. Sheridan, and held under aforesaid agreements, defendant paying the taxes and expenses thereon.

That the Knisely claim had become a final judgment for the sum aforesaid, and a lien on the real estate conveyed by plaintiff to defendant under the contract of 1914; that the probate court issued an order directing the sale of the real estate belonging to plaintiff's testator at the time of his death, for the purpose of paying said claim; that the said real estate was about to be sold, and it became necessary for the defendant either to sell said properties under the contract with plaintiff and satisfy said judgment, or to advance funds to enable defendant to take an assignment of the judgment to it, or some person for it, and carry the said property under the contracts until it could be disposed of at a fair market value, to enable defendant to reimburse itself for the moneys due it.

It is further alleged that a writ of execution had been issued upon a judgment for $10,566.57 in favor of one Grafeman against the plaintiff and the investment company, and the sheriff levied on the equitable interests of the plaintiff in and to parcels 2, 3, 5, 6, and 7, and in September, 1917, the sheriff sold the same under the execution to said Grafeman. That because of said suit and the judgment in favor of Grafeman against plaintiff, defendant, and the Leathe Estate Investment Company, it became necessary to take an assignment of the Knisely judgment to protect plaintiff and defendant, and on June 15, 1918, the defendant advanced the necessary money to purchase that judgment, amounting to $226,329.99, the amount of said judgment, interest, and costs, and took an assignment thereof in the name of Earl F. Nelson, but for the use and benefit of the trust. It then sets out a sale of a part of the property in parcel 3.

It denies that it sold the 1,225 shares of stock hereinbefore described, to Thomas J. Sheridan, but states that in October, 1916, it advertised said stock for sale and the only offer was made by Thomas J. Sheridan for $10,000, but he held said stock for the plaintiff and defendant under the trust agreement hereinbefore described until February, 1920, when said stock was sold for $37,975, and that amount credited to the plaintiff on her account.

[1] 178 S. W. 453.

It denies that it misrepresented the value of said stock, or misled plaintiff regarding it, or has been guilty of any negligence, in violation of its duty as trustee, in permitting said stock to decline in value, and denies that the stock was disposed of for an inadequate price, but alleges that at no time did it make any representations to plaintiff, or to any one as to the value of said stock, but made diligent efforts to sell same for a fair and reasonable price and obtained the best price possible.

It further stated that it still holds under the contracts parcel 3, less 75 feet sold, and parcels 2 and 5, for the trust. It denies that it has refused to render a full and adequate statement of its trusteeship, but on the contrary has rendered to plaintiff and her attorneys a history of all transactions under the agreements.

It filed a counterclaim setting up all the facts as stated in their answer, and asks for a foreclosure of the unsold property held by it to satisfy the balance due from the plaintiff.

The plaintiff, in her reply to the counterclaim, denies the allegations in the counterclaim as to the purchase of parcels 2, 3, and 5, but charges that the sale by the sheriff under the execution in the Grafeman judgment, divested the plaintiff and the investment company of all right, title, and interest to the parcels bought by Grafeman. It denies the correctness of the account, or that the sales had been made for fair and reasonable prices, and denies that there is any money due to the defendant from the plaintiff, but that it is indebted to her, as charged in the complaint, and therefore is not entitled to any decree against her. Copies of the agreements are filed as exhibits to the counterclaim.

As the agreements are quite lengthy, it would serve no useful purpose to set them out in full. It is sufficient to state that the agreement of 1914 provides: To induce the defendant to guarantee the title of realty, she acquired under the will of her deceased husband, when sales of any part thereof are made, she conveyed certain realty to it, described in the agreement, to indemnify it against loss by reason of guaranteeing the title. The defendant agreed to reconvey the property conveyed, or so much thereof as was still unsold, after the claim of Knisely is finally settled or otherwise disposed of.

If the Knisely judgment is not satisfied or otherwise disposed of the title company was authorized to sell so much of the realty conveyed to it, as is necessary to satisfy the judgment, and also all other charges. The sales may be either at public or private sale and if after doing so, any property or proceeds of sale are left to return it to the plaintiff. Mrs. Leathe was to pay all taxes, interest, and the principal of the debts secured by deed of trust on the property when due, or renew the loans with the consent of the title company. If she failed to do so, the defendant was authorized to pay them, and have a lien on the premises conveyed and sell them for the purpose of reimbursing itself.

It is further provided that when sales are made by the title company, cash or other satisfactory securities for the full selling price, less ordinary commissions and costs of sale shall be delivered to the title company, and sets out the amount required for each parcel sold. All moneys advanced to bear 8 per cent. per annum (this was reduced by defendant to six per cent.), but whether any advances should be made is left optional with the title company.

The agreement of May 29, 1915, between the investment company and the defendant provides for the conveyance to the defendant, as additional security under the 1914 contract, the realty described as parcels 5, 6, and 7, to be held under the terms and conditions set out in the agreement of April 7, 1914.

The case was referred to a special master, who heard all the evidence, and recommended, in a very elaborate report, in which he stated the pleadings, his findings of fact, and as his conclusions that plaintiff is not entitled to any relief on her complaint, and that the defendant is entitled to the relief prayed in the counterclaim, finding the balance due the defendant from the plaintiff to be $359,078.31, for which it is entitled to a foreclosure.

Exceptions to the special master's report filed on behalf of the plaintiff were by the court, after a patient hearing and after having been taken under advisement, overruled, and a decree on the original complaint and the counterclaim, as recommended by the special master rendered.

The premises were by order of the court sold by a special master, and after confirmation of the sale, exceptions thereto by the plaintiff, having been by the court overruled, a deficiency decree was rendered against her for $136,402.23 and the costs, expenses, and allowances of the special master amounting to $4,768.90.

From this decree this appeal is prosecuted.

[1] At the very outset, we are met by the contention of counsel for defendant that a decree based on the findings of a special master on conflicting evidence, and on exceptions approved by the chancellor, will not be set aside by an appellate court.

This contention, however, is subject to the exception that, if the findings of the master were caused by an obvious error in the application of the law, or some serious mistake has been made in the consideration of the evidence, or the findings are clearly not warranted by the evidence, being against the weight thereof, the appellate court may set aside the findings. Fienup v. Kleinman, 5 F.(2d) 137, 141 (C. C. A. 8), and authorities there cited.

In the instant case it appears that the special master was exceptionally well qualified to act as such in an action of this importance. He had been one of the Commissioners of the Supreme Court and of the St. Louis Court of Appeals of the State of Missouri, and at the present time is again a Commissioner of the Supreme Court of that state. His elaborate report shows the care with which he considered the evidence. His findings and the conclusion of the chancellor, after careful examination of the entire record, approving them, are certainly entitled to high consideration, and ordinarily would be considered by this court as conclusive. Commercial National Bank v. Stock Yards Loan Co., 16 F.(2d) 911 (C. C. A. 8). But in view of the large amounts involved and the fact that the defendant was a trustee of an express trust under its contract with the plaintiff, we feel that it is proper to reach our own conclusions, giving due weight to the findings of the special master and the chancellor.

The contention of counsel for plaintiff, that the burden to show that a trustee has properly performed the trust and the manner of its performance is on the defendant, is not questioned by counsel for defendant, and the special master so held. It is therefore unnecessary to consider it.

The master further held that "it was the duty of the defendant to exercise in the sales of plaintiff's realty the same care, prudence, and diligence that men of common prudence ordinarily exercise in their own affairs." The correctness of this statement of the law is not questioned.

[2] The first question to be determined is: Was the defendant a volunteer or meddler in paying off the Knisely judgment, as contended on behalf of plaintiff, and therefore not entitled to charge the plaintiff with the amount paid therefor? The claim that this judgment, which became final on June 2, 1915, might have been obtained for less than the amount thereof, is clearly without merit, as there is no evidence to sustain it, and no reason given why a judgment, which is a lien on realty, worth several times the amount of the judgment, should be sold at a discount. The judgment being a lien on the estate, which consisted of real estate, most of which was unproductive, could only be satisfied by sales of some of the realty, and with this judgment lien on all of the estate, none could be sold by the plaintiff, either as executrix or legatee, until it was satisfied. It was therefore absolutely necessary to pay this judgment, to prevent a sale under execution, under the mandate of the court, as threatened by Knisely's executrix. To enable the plaintiff to make sales of the property, and satisfy that judgment, when it became final, was the main object of the contracts between the parties, as only upon execution by the defendant of a guarantee of the title would any intending purchaser be willing to make the purchase, or a bank make a loan on its security. The fact that the judgment was assigned to one of the defendant's officers is immaterial, as the amount paid was charged to the plaintiff and was in fact and equity held by the defendant for the benefit of the trust estate, and the statements furnished to plaintiff and her attorneys showed it.

Without satisfaction of that judgment, or an assignment, which in legal effect was a satisfaction, no sales of the property of the estate could have been made, unless the defendant guaranteed the title, and on the guaranty it would have clearly been liable, if any of it would be seized and sold under the execution issued to satisfy the Knisely judgment.

Prior to the execution of this agreement, and before it had been determined by the Supreme Court of the State that Knisely was entitled to recover a judgment against the Leathe estate, the plaintiff had sold a number of parcels of real estate of the estate, and executed mortgages on others, on which the Knisely judgment was also a lien, and she liable on her warranty.

The judgment in the Knisely Case only became final on July 2, 1915, although, by the judgment of the Supreme Court, in favor of Knisely, which was rendered before the execution of the contract, the only question left for determination by the trial court was the amount the Leathe estate was to held liable for.

There is no merit in this contention of plaintiff.

[3] In this connection it may be proper to dispose of plaintiff's contention, in relation to the sale of the Washington avenue parcels, under the Grafeman judgment against the plaintiff and the Leathe Estate Investment Company. Grafeman had a judgment against the plaintiff and the Leathe Estate Investment Company for $10,500 and interest, and had an execution levied on plaintiff's equity in those parcels. They were purchased by him at the execution sale. That judgment was on a note of the plaintiff and the investment company.

The contention is that it was the duty of the defendant, as trustee, to pay off this judgment and charge it to the plaintiff. There is no evidence that the defendant had funds belonging to the plaintiff, sufficient to pay off that judgment, without impairing the security it had for its own indemnity. But assuming that the securities it had in its possession were ample to justify the payment of that judgment, which in fact, as shown by the result of this litigation, was not the case, but on the contrary the property when sold under the decree of the court, was insufficient to pay the amount due defendant from plaintiff by about $141,100 in round figures, still it was not its duty to pay that judgment to prevent a sale of plaintiff's equity without a request from the plaintiff to do so, and an offer to secure the title company for the advancement of the money necessary to pay it.

While it is true that, by the purchase of the equity of plaintiff Mr. Grafeman acquired whatever her interest was in the premises bought by him at that sale, as had been determined by the judgment of the courts in an action by him against the plaintiff and defendant, this equity has now by reason of the decree in this cause become worthless, with the result that not only has the plaintiff not been prejudiced by reason of that sale, but in fact benefited, as that purchase satisfied Grafeman's judgment.

Counsel's contention as to the payment of the Knisely judgment would have applied with greater force, if the defendant had paid the Grafeman judgment under the conditions then existing.

The finding of the special master was right.

Next is the claim relating to the sale of the Poplar street property for $300,000 to the representatives of the Santa Fé Railroad Company. At the time the sale was made, the plaintiff was about to default in the payment of a $50,000 balance due on a loan secured by a second mortgage on that property, and only after considerable effort was the defendant able to obtain this price for the property.

Plaintiff's contention is that the property was among the most valuable in the city of St. Louis, and was worth $1,000,000. The great preponderance of the evidence, taking into consideration knowledge of values of real estate in that part of the city by the witnesses, as well as their testimony on cross-examination, as the special master did, sustains his finding that the price obtained for this property was the fair market price. In fact, the evidence warrants a finding that it was sold for more than its then market value. The railroad company bought it and adjoining property for the purpose of using the land for railway uses. Shortly thereafter it made other arrangements and the lots are still unused and vacant.

Paragraph 2 of the contract authorized the title company to sell the real estate, acquired by it under the agreements, or any part thereof, when necessary, either at public auction or private sale.

Generally realtors, by taking time to find purchasers and negotiate for a sale of valuable realty, secure much better prices than if there is a forced public sale. It is also proper to state that when the Leathe Estate Investment Company was organized for the purpose of handling the lands in the agreement between plaintiff and defendant, the value of this property was placed at $300,000.

Parcels 2, 3, and 5, on Washington avenue, other than the premises sold to Mr. Brown, had been mortgaged by the plaintiff to the Mortgage Trust Company, to secure an indebtedness amounting, with accumulated interest at the time of the sale, to $147,830. The plaintiff, having defaulted in the payment of the debt, the property was advertised for sale by the trust company under the power of sale in the trust deed, and at such sale defendant purchased the property for the benefit of the trust estate. For convenience the title was first taken in the name of one Sheridan, one of its employees, and when Sheridan went into the army in 1917, defendant caused Sheridan to convey the premises to one Thomas F. Stevens, another of defendant's employees, who held the title in trust for the parties under the contracts.

[4] Counsel for defendant concedes the claim of plaintiff that a court of equity will not permit a trustee to purchase the property

of his cestui que trust under a paramount title, but they contend that if the purchase is made for the purpose of protecting the interest of the trust, including its own interests, and is not for the personal gain of the trustee, nor held adversely to the beneficiary of the trust, the rule does not apply. In this contention for the defendant we concur, and the law is too well settled to require the citation of authorities.

[5] The amount paid for the lots and all taxes paid thereon were charged to plaintiff's account on the dates they were paid, and a complete statement of the account of plaintiff was on May 20, 1915, furnished to the plaintiff and on December 31, 1918, to her attorney, Messrs. Barclay & Wallace, showing this charge of $147,840 paid to the Mortgage Trust Company for this property. A similar statement was furnished to Mr. J. E. Carroll, another attorney for plaintiff, on February 28, 1922.

This is conclusive that the defendant did not intend to acquire the title to these premises for its own use, but in trust for the plaintiff, and that the title to the premises was taken in the name of an employee for convenience only, as financial institutions frequently do, to prevent a showing of owning too much real estate, especially, if unproductive, as nearly all this was.

Parcels 1 and 4, on Washington avenue, were contracted to be sold to Mr. Paul Brown. The alleged consideration was $500,-000, $100,000 of the consideration was paid in money, $225,000 was an assumption by Mr. Brown of the mortgage liens on them, and $175,000 by a transfer of 1,225 shares of the Clayton Road Realty Company.

It is contended for the plaintiff that the 1,225 shares of the stock were worth, not exceeding $37,975, for which sum it was later sold; that being the amount obtained at the time of their sale, and credited to her account, and therefore that the defendant is chargeable with the difference between that sum and the $175,000 for which the defendant accepted it as part of the purchase price amounting to $137,025.

But the evidence establishes that the defendant declined to accept these shares as a part of the consideration at the valuation of $175,000, but that Mr. McCawley of the Hildenbrandt & Noble Realty Company, the agents of the plaintiff for the sale of the property, and Judge Huff, the president of the investment company, to which the plaintiff had conveyed the lots, urged the acceptance of these shares at that valuation, and the plaintiff agreed thereto, and only because so directed did it accept the shares at a valuation of $175,000, but not for its own benefit.

The claim that the Hildenbrandt & Noble Realty Company, whose employee McCawley was (he was also assistant secretary of the investment company), had no authority to act as agents for the plaintiff or the investment company, which was in fact the plaintiff, being the owner of all the stock, is clearly untenable in the face of the resolution adopted unanimously by the board of directors of that company at a meeting held on May 23, 1914, more than a month after the contract between plaintiff and defendant was made. That resolution was introduced by the plaintiff and reads: "The exclusive agency contract of date December 17, 1913, between Grace A. Leathe and the Hildenbrandt & Noble Realty Company concerning the real estate now owned by the Leathe Estate Investment Company, be adopted as the contract between this corporation and the said Hildenbrandt & Noble Realty Company, covering all matters therein set forth." At the same meeting the board accepted and ratified the assignment to it of the contract between the plaintiff and defendant "and accepts the same fully as to the terms and provisions of said contract and assignment."

On May 20, 1915, the defendant furnished the plaintiff, according to her own testimony, a complete statement of the sale to Mr. Brown, showing the amount for which the premises were sold, viz. $500,000, of which $175,000 was the stock accepted as part of the purchase money, the assumption by Mr. Brown of the mortgages on the parcels, amounting to $225,000, and the expenditures in connection with the sale, including the commissions paid to the realtors for making the sale, and the charge for guaranteeing the title for $415,000. On May 25, 1915, at a meeting of the board of directors of the investment company, at which the plaintiff was present, this statement, showing the disposition of the funds received by the defendant from Mr. Brown, including the commissions paid to the realtors and the charge for the guarantee of title, was read and approved.

Mrs. Leathe testified that Mr. Anderson, then vice president of the defendant, and Senator Wilfley, its attorney, represented to her that these shares were worth $240,000 to $260,000, which induced her to consent to their acceptance at a valuation of $175,000. Both of these gentlemen positively denied making any such or other representations to her relating to the value of these shares.

It is shown that, although, at the public sale of this stock, it was bought in the name of one of defendant's employees at the price of $10,000, the plaintiff was credited with $37,975, less the broker's commission, realized from this stock when finally sold, and that this was its full market value and the best price obtainable therefor.

That the defendant did not consider the value of these shares to be $175,000, or anything near that sum, as claimed by plaintiff, is also evidenced by the fact that it insisted on additional security, by reason of the fact that they only received $100,000 in money and the assumption by Mr. Brown of the mortgages on the premises, amounting to $225,000, and did not consider the value of the stock as of $175,000, which additional security was furnished by the plaintiff, when she caused the investment company to convey to the defendant parcels 5, 6, and 7 on May 29, 1915, immediately after the contract for the sale to Mr. Brown was made.

It is also in evidence that at a meeting of the directors of the Leathe Estate Investment Company, to whom the plaintiff had conveyed all her equities in these parcels, held on May 22, 1915, the plaintiff being present, the contract of sale to Mr. Brown was ratified and the president directed to execute a deed to the lots described as parcels 5, 6, and 7.

We see no reason for setting aside the special master's finding which is clearly warranted by the great preponderance of the testimony; in fact, we might say by conclusive evidence.

[6] It is also claimed that the charge by the defendant for guaranteeing the title for the sum of $415,000 and paying the real estate agents a commission on that sum, when they should have charged only for what she received credit for after these shares had been sold, should be surcharged. It is claimed that the charge of the defendant for guaranteeing the title and for commission paid to realtors should have been only on $359,-875, a difference of $53 on the title guaranty by the defendant, and $136.50 as agent's commission, and should be reduced accordingly.

As to the defendant's charge, the purchaser had the right to demand from the plaintiff a guaranty of title, equal to the entire consideration of $500,000, and at first demanded the guarantee for that sum, but finally agreed to accept a guarantee for only $415,000. It certainly cannot be claimed that this was prejudicial to plaintiff.

[7] This also applies to the commission paid

18 F.(2d)—4

to realtors. The commissions paid were those uniformly charged by realtors in that city. That they saw proper to divide the commission with another realtor, who was also a director of defendant, was their right, and plaintiff was not prejudiced thereby.

[8] Besides, as hereinbefore stated, the statement furnished to the plaintiff, immediately after the sale to Mr. Brown had been made, showed these charges, was not only not objected to by either the plaintiff or the investment company, but was approved by the board of directors. Even without such an approval, the failure to object to it within a reasonable time made it an account stated, and estops its recipient from denying his liability for the charges it contains whether he is actually liable for them or not. Oil Co. v. Van Etten, 107 U. S. 325, 1 S. Ct. 178, 27 L. Ed. 319; Leather Manufacturers' Bank v. Morgan, 117 U. S. 96, 107, 6 S. Ct. 657, 29 L. Ed. 811; Porter v. Price, 80 F. 655 (C. C. A. 8); Patillo v. Allen-West Com. Co., 131 F. 680, 687 (C. C. A. 8); Boise v. Talcott, 264 F. 61, 66 (C. C. A. 2); In re Hawks (D. C.) 204 F. 309, 315, affirmed by this court 213 F. 177.

The record in this case is one which arouses the sympathy of a chancellor. She was the owner of an estate of great value, devised to her by the will of her deceased husband. It exceeded, at the time of the death of Mr. Leathe, considerably more than a half million dollars, the debts of the estate, including the Knisely claim. Prolonged litigation of that claim, which originally was for $107,500 and finally resulted in a judgment against the estate which, when paid, amounted to $226,321.96; interest on loans obtained by her and secured by mortgages executed by her before the agreement with the defendant, some of them bearing 8 per cent. interest, besides large commissions to brokers for procuring and renewing loans; large amounts paid to numerous lawyers of the highest standing in the profession, employed by her during the many years since her husband's death; commissions to real estate agents on sales of property, general and special improvement taxes running into the thousands annually, finally dissipated the entire estate. In 1918 the special taxes on the Washington avenue parcels amounted to $3,676.61 and in 1919 for widening the street $7,349.55. The general taxes increased annually, while the special taxes decreased some. The general taxes paid in 1919, for the years 1916, 1917, and 1918, amounted to $21,371.02 and the general taxes for 1919 with a special sprinkling tax for $345 to

$8,058.09, in 1920 to $7,798.66, and in 1921 to $7,716.67, and a sprinkling tax for 1919 to 1922 for $294.70. With such expenditures and no income from the property, for what little property produced income (the plaintiff was by the terms of the agreement authorized to collect), all the defendant collected during the entire period amounted to about $3,500, a large part of which was from rentals for billboards and such other uses as unimproved city lots may be occasionally rented for, it is easy to understand how the most valuable property will be dissipated in the course of nearly twenty years. (The Knisely suit was pending when Mr. Leathe died in 1907. How long it had then been pending the record does not show.)

[9] We have read and re-read this voluminous record and find no evidence that the defendant failed to discharge its duty as trustee in a manner required by the strictest rule of equity jurisprudence.

In our opinion no other conclusion than that reached by the special master and confirmed by the court below could be sustained.

Some other alleged errors were raised by counsel. They have received careful consideration by us and found to be clearly without merit. They are not of sufficient importance to require prolonging this opinion, as they relate only to minor questions of fact.

We find the decree of the District Court free from error, and it is accordingly affirmed.