## KRETNI DEVELOPMENT CO. v. CONSOLIDATED OIL CORPORATION et al.

### No. 1115.

Circuit Court of Appeals, Tenth Circuit.

Dec. 28, 1934.

N. E. Corthell, of Laramie, Wyo. (A. W. McCollough and M. E. Corthell, both of Laramie, Wyo., on the brief), for appellant.

C. R. Ellery, of Cheyenne, Wyo. (G. T. Stanford and R. W. Ragland, both of New York City, on the brief), for appellees.

Before McDERMOTT and BRATTON, Circuit Judges, and POLLOCK, District Judge.

BRATTON, Circuit Judge.

The owners, by location, possession, and otherwise, of the mineral rights in certain land situated in the Ferris Field in Carbon county, Wyo., leased the land for oil and gas purposes to C. Ray Ferris on April 15, 1918, retaining a royalty of one-eighth part of the oil or gas produced or the proceeds derived from the sale of such royalty. The provision relating to the royalty reads: "The lessee agrees to deliver to the credit of the lessors, their heirs or assigns, or to such person or trustee as they may designate, free of cost at the pipe lines, to which he may connect his wells, one-eighth part of the oil or gas produced and saved from said premises or the proceeds derived from the sale of said one-eighth part of said oil or gas."

Producers' & Refiners' Corporation, hereinafter called Producers', acquired by assignment 75 per cent. of the rights of Ferris under such lease, and Kretni Development Company, hereinafter called claimant, acquired in like manner the royalty interest. On August 14, 1920, claimant as party of the first part, and Producers' as party of the second part, entered into an agreement in which it was provided that the former should make application to the Commissioner of the General Land Office, under the provisions of section 19 of the act approved February 25, 1920 (41 Stat. 437 [30 USCA § 228]) for leases and permits to prospect for oil and gas on certain portions of such land. The agreement contained the following provision concerning the royalty to be thereafter paid

to claimant: "Upon such of the above-described lands to be included in such application as any of the parties hereto shall secure a Government lease, at a rental or royalty reserved to the Government, it is hereby agreed that primarily the rentals and royalties so reserved shall be paid by the party of the second part, and that the same shall become part of the expense of operating said property and leases under the terms of said assignments of leases and that in lieu of the royalties provided by said original lease, and hereinabove referred to, to be paid to the lessors, there shall be paid the following amounts: (a) Whenever the royalty to be paid to the Government shall be twelve and one-half per cent (12½%), the royalty to be paid to the party of the first part shall be seven and one-half per cent (7½%); (b) whenever the royalty reserved to the Government shall be more than twelve and one-half per cent (12½%), the excess over and above twelve and one-half per cent (12½%) shall be paid one-half by each of the parties hereto, but in no event shall the royalty to be paid to the party of the first part be less than five per cent (5%)."

Claimant submitted its application and two leases were issued, both dated July 11, 1925. One covered a portion of the land and fixed a gas royalty of 5 per cent.; the other covered additional tracts and provided a royalty of 12½ per cent. of the gas if the average daily production for the calendar month should be less than three million cubic feet and 16⅔ per cent. if such production should exceed that amount. It further provided a royalty of 16⅔ per cent. on casinghead gasoline produced. Each lease authorized the Secretary of the Interior to fix the value of the royalty.

Producers' developed the leased land and produced gas thereon in commercial quantities. The only market for gas produced in that field or others nearby was at Casper, Wyo., where the refineries of Midwest Refining Company, hereinafter called Midwest, were located, a distance of ninety miles. But there were no transportation facilities. For the purpose of utilizing that market Producers' and Midwest entered into a contract on August 27, 1921, for the construction of an adequate pipe line system from the field to the refineries. Each company was to pay half the cost and own an undivided half interest in the system. Producers' was to operate it, each company paying half of the expense. Midwest agreed to advance to Producers' $400,000 by supplying each month 60 per cent. of its share of the construction expense during that month. The agreement further provided that Midwest should purchase from Producers' thirty million cubic feet of gas per day. That part fixing the quantity, price, and place of sale provides: "The Midwest agrees to pay the Producers' company the sum of four cents per thousand cubic feet at the well or wells for all gas sold and delivered under this agreement, and for the transportation of said gas to the refineries at Casper, agrees to pay the sum of seven cents per thousand cubic feet, of which transportation charge it shall retain one-half on account of its half interest in said pipe line."

The $400,000 advanced to Producers' with interest thereon was to be repaid exclusively by Midwest retaining the amount due Producers' from the pipe line charge thus provided. The contract was modified from time to time and a complete substitute agreement was entered into on October 1, 1929, in which it was provided that from such date to September 1, 1931, the 7 cents transportation charge should be divided in the proportion of 4 cents to Producers' and 3 cents to Midwest, and that from September 1, 1931, to the end of the agreement it should again be divided equally between the parties. But throughout the sale price of the gas and the place of its delivery remained unchanged.

Producers' sold to Midwest under the terms of their agreements mentioned, the gas produced on the leased land in which claimant had an interest, the sale price being 4 cents per thousand cubic feet at the point of intake to the pipe line in the field. Monthly reports and remittances were made to claimant for about eleven years on the basis of sales at that price.

This action was instituted on May 7, 1932, for the appointment of receivers for Producers' and liquidation receivers were appointed on that day. On July 11, 1932, an order was entered in the cause directing all those having claims or demands against the corporation to file them with the receivers on or before October 1, 1932, and directing the receivers to give notice thereof. Claimant filed its claim for $7,614.37 within the specified time. It was in two parts: First, payment of royalty at 12½ per cent. instead of 7½ per cent., $2,285; and, second, the right to be compensated on the basis of 5 cents per thousand cubic feet instead of 4 cents, $5,329.37. Thus computed it was asserted that the amount due was $7,614.37. The court entered an order on March 20, 1933, directing claimant to file a more detailed statement of its claim. Pursuant to that order, claim-

4

ant filed a pleading called a bill of complaint in which it was alleged that the royalty was 12½ per cent.; that the price Producers' received for such gas was much greater than 4 cents per thousand cubic feet; that an arbitrary division of the proceeds derived was made in disregard of the value of the gas and the value of the pipe line service; that a fair and reasonable division of the proceeds between the two would have netted claimant not less than 6 cents per thousand cubic feet and that Producers' extracted and recovered large quantities of gasoline from such gas for which it failed and neglected to account, the exact amount being unknown. An accounting and recovery was prayed in the sum of $16,000.

The receivers pleaded, among other things, that the original lease provided that the royalty should be one-eighth of the gas produced at the pipe line to which the well was connected or the proceeds derived from the sale of such royalty at that point; that in entering into the contract of August 14, 1920, it was the mutual intention of the parties that in consideration of producers' assuming the burden of paying the rentals and royalties required by the United States the royalty due claimant should be reduced from 12½ per cent. to a maximum of 7½ per cent. and a minimum of 5 per cent.; that the royalty gas had been sold at 4 cents per thousand cubic feet, its reasonable market value; that full payment had been made currently; and that such payment constituted an accounting and settlement.

After extended hearings the court found that in entering into the agreement of August 14, 1920, modifying the royalty provision contained in the original operating lease, it was the intention of the parties to provide that whenever a royalty of 12½ per cent. or less should be paid to the United States, the royalty to claimant should be 7½ per cent.; that the words "or less" should have followed immediately the figures 12½ per cent. and were inadvertently omitted; that the royalty due was 7½ per cent. and that the market value of gas in the field during the period in question was 4 cents per thousand cubic feet; that the royalty gas was sold to Midwest at the point of intake to the pipe line for that price; that claimant knew since 1925 that Producers' and Midwest constructed the pipe line system as a joint enterprise to which Producers' contributed money and was interested in its operation; that claimant accepted monthly payments for the royalty gas during a period of almost eleven years with little contention respecting their correctness

in amount. It was concluded as matters of law that title to such royalty gas passed to Midwest upon its delivery into the pipe line in the field; that claimant had no right, title, or interest in it thereafter; that claimant was entitled to receive the fair market value of such gas at the point of delivery; that full payment had been made therefor and that the several items in the claim were each barred by laches. The claim was disallowed in toto and this appeal followed.

The first contention advanced for reversal of the decree relates to sale price of the gas. It is said that the division of 4 cents for the product and 7 cents for pipe line transportation made in the contract between Producers' and Midwest was arbitrary; that a fair division between the two would have netted claimant more than 4 cents per thousand cubic feet. Recovery for that difference is sought. That takes us immediately to a consideration of the status of the parties; that is, whether they bore such a fiduciary relation that Producers' was required to share ratably with claimant the profit derived from the operation of the pipe line system and the profit arising from the gasoline extracted and sold. The previously quoted provision contained in the original operating lease, followed by the several assignments, obligated Producers' to deliver to claimant free of cost, at the point of connection with the pipe line to which the well was connected, the specified royalty or the proceeds arising from its sale. By common consent the gas belonging to claimant and that belonging to Producers' was delivered together into the pipe line for transportation to Casper. The place at which delivery should be made in kind is definitely fixed in the contract. It is the point of connection with the pipe line. The place at which the gas should be measured and its price fixed in case of sale is in a measure indefinite and ambiguous. The language "or the proceeds derived from the sale of said one-eighth part of said oil or gas" must be construed from the context of the instrument, the circumstances attending its use, and the construction placed upon it by the parties. Pipe line facilities did not exist at the time the instrument was executed. The parties must have anticipated that transportation would be provided, but they certainly could not reasonably have contemplated that the lessee, either alone or in conjunction with another, would provide it to a far removed point of consumption and that they would share in the common ownership of the gas until it reached that destination and was sold there. The cost of transportation might

equal or exceed the value of the gas in the field. The language and the circumstances in which it was used fail to indicate that the parties had such an eventuating situation in mind. It may be conceded for the purpose of this case that a lessee is obligated to put forward a reasonable effort to market gas produced on the leased premises, but certainly that duty does not extend to the point of providing pipe line facilities ninety miles in length at a large outlay of money with an attending financial hazard due to possible exhaustion of the supply and other frequently encountered factors, in order to reach a market at which the product may be sold. We think it is clear that the parties contemplated that the lessors or their assigns should be entitled to the royalty gas at the connection with the pipe line, or the proceeds from its sale at that point. There is nothing to indicate that they intended to provide different places. That is the only reasonable construction which the provision contained in the operating lease will bear and renders its two features symmetrical. Provisions identical in effect have been so construed in similar circumstances. Scott v. Steinberger, 113 Kan. 67, 213 P. 646; Wall v. United Gas Public Service Co., 178 La. 908, 152 So. 561; Rains v. Kentucky Oil Co., 200 Ky. 480, 255 S. W. 121. Furthermore, the parties construed the contract that way for almost eleven years and it is a cardinal rule of universal recognition that a court will give great weight to the interpretation contracting parties place upon indefinite and ambiguous language contained in their agreement.

█ Of course, the sale price must be the fair and reasonable value of the product, but here the court expressly found that it was measured and sold at its fair value at the connection with the pipe line in the field and that title passed there. That finding is supported by substantial evidence and no mistake appears in the consideration of the evidence. The finding will therefore not be overthrown on appeal. It may be appropriate to say parenthetically that the total amount of gas produced from the leased premises is not questioned. The integrity of the records relating to that matter is not challenged. The controversy concerns itself exclusively with the proportion which was royalty and the manner in which it was marketed; that is, the revenues derived from it.

█ Claimant asserts that the royalty on the class (a) lands was fixed at 12½ per cent. and that payment was made on the basis of 7½ per cent. The court expressly found that it was the intention of the parties in executing the contract dated August 14, 1920, to provide that whenever a royalty of 12½ per cent. or less should be paid to the United States, the royalty to claimant should be 7½ per cent.; that the words "or less" should have followed the figures 12½ per cent., but were inadvertently omitted. That finding is challenged on the ground of being unsustained by substantial evidence. It has some support in the fact that the contract expressly provided that the royalty which Producers' paid to the United States should be absorbed as a part of the operating expenses and it was necessary to reform the royalty clause or to eliminate that provision from the contract. Both could not stand together. Apart from that question, however, Producers' contended that the royalty was 7½ per cent. and accounted on that basis. Claimant learned in 1923 the quantity of gas Producers' was required to deliver to Midwest under the terms of their contract, the sale price at the connection with the pipe line, the amount of the transportation charge, and the manner in which it was divided between the parties. Those provisions of the contract were shown to one of its officers about a year after the pipe line was placed in operation, and the record fails to indicate that any effort was made to conceal the other terms of the agreement. Claimant made infrequent and feeble objections concerning the amount of the monthly payments until about 1926, but they related almost exclusively to the sale price of the gas at the intake to the pipe line, and that contention rested almost exclusively upon the fact that 5 cents was being paid the United States for its royalty gas. That price was fixed by the Secretary of the Interior under the terms of the lease authorizing him so to do and was paid under protest, Producers' contending that the fair value of such gas was 4 cents. Claimant made scant reference to the proportion of the royalty and the infrequent and feeble protest ceased in 1926. With full knowledge of the essential facts affecting its interest, it received monthly reports and accepted monthly payments for almost eight years computed on the basis of a royalty of 7½ per cent., manifestly realizing that such payments were made with the understanding on the part of Producers' that they constituted full payment for the royalty gas. The acceptance of payment in that situation must be held to constitute a stated and settled account which cannot be impeached after such long delay except for fraud or mistake. Standard Oil Company v. Van Etten, 107 U. S. 325, 1 S.

Ct. 178, 27 L. Ed. 319; Fitzgerald v. First National Bank (C. C. A.) 114 F. 474; Boise v. Talcott (C. C. A.) 264 F. 61; In re Hawks (D. C.) 204 F. 309, affirmed on other grounds, (C. C. A.) 213 F. 177; Leathe v. Title Guaranty Trust Co. (C. C. A.) 18 F.(2d) 41; State v. Illinois Central Ry. Co., 246 Ill. 188, 92 N. E. 814.

■ Finally, claimant strives to recover a share of the profits derived from the gasoline extracted from the gas after its delivery into the pipe line. Extended discussion of that contention is unnecessary. We have said that the gas was sold and title passed to Midwest upon its delivery into the pipe line in the field. Claimant's rights to it were measured and ceased there. It had no further interest in it thereafter. Its exclusive right was to the proceeds derived from the sale and they have been paid in the manner already reviewed.

We think the court was right in disallowing the claim, and the decree is affirmed.