**ASHLAND OIL & REFINING COMPANY, a corporation, Plaintiff,**

v.

**STAATS, INC., a corporation, and Myron L. Hall, Wave Hall, and Robert W. Baughman, Defendants.**

**Civ. A. No. W–3333.**

United States District Court
D. Kansas.

April 14, 1967.

Foulston, Siefkin, Powers, Smith & Eberhardt, Wichita, Kan., Arloe W. Mayne and G. Fred Charles, Ashland, Ky., H. L. Hester, Houston, Tex., and J. M. O'Loughlin, Oklahoma City, Okl., for plaintiff.

Ronald Kaarbo, Liberal, Kan., for defendants.

## MEMORANDUM SUSTAINING MOTION FOR SUMMARY JUDGMENT

WESLEY E. BROWN, District Judge.

This civil action in the nature of interpleader under 28 U.S.C. § 1335, is before the court on motions for summary judgment filed by all parties. The value of the property or obligation herein is more than $500.00; jurisdiction exists under 28 U.S.C. § 1335. Venue is proper under 28 U.S.C. § 1397.

Plaintiff Ashland Oil & Refining Company is a corporation organized and existing under the laws of the Commonwealth of Kentucky, and its principal place of business is at Ashland, Kentucky. Defendant Staats, Inc., is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business at Oklahoma City, Oklahoma. The individual and intervening defendants are citizens and residents of states other than Kentucky. Ashland acquired the oil and gas leases and gathering system involved herein by purchase on March 1, 1963, from the United Carbon Company which had prior thereto acquired such lease from the United Producing Company, Inc. [Pre-Trial Order ¶ 7(g)].

The claims raised herein were first asserted in two state court suits by certain royalty owners, prosecution of which was enjoined when this action was filed. Interest in the claims asserted apparently was first aroused by letters circulated by Edwin G. Staats, as president of Staats, Inc. Staats is a former landman with United Producing Company and United Carbon Company, who resigned his employment in 1963 and formed the corporation. The form letter [Complaint, Exh. A] was sent to royalty owners under the leases dedicated to the Cities Service gas purchase contract, advising such owners that their royalty payments were incorrectly computed, and requesting that they sign enclosed contracts, authorizing Staats, Inc., to represent the owners in recovering additional royalties thought to be owing, in return for fifty per cent of amounts recovered, Staats, Inc., to pay all costs. [Complaint, Exh. B] Royalty owners under 105 of the 362 leases are thus represented herein. [Pre-Trial Order Exh. 48]

Two basic legal issues are presented:

1) Does Ashland owe royalty on that portion of Cities Service Gas Company's payments to Ashland, under Ashland-Cities gas purchase contract, stated therein to be charges for gathering and transporting gas through Ashland's 153-mile pipeline system for delivery to the purchaser's pipeline.

2) Does Ashland owe and must it now pay royalty on a one cent (1¢) increase in the wellhead price of natural gas, now being collected but which may be subject to refund if the Federal Power Commission ultimately disapproves the increase, or some portion of it.

The oil and gas leases in question constitute a large block in the Hugoton Gas Field, in Grant and Haskell Counties, Kansas. They were assembled by the United Producing Company, Inc. in the 1930's and 1940's, and unitized into 640-acre units. United Producing has drilled a total of 119 wells into the Hugoton pay zone; an additional five wells produce from the Panoma Field.

The pipeline system which gathers and transports gas from the wells in question was constructed by United Carbon Company, Inc., (Maryland) prior to 1942, when United Producing owned the leases, and the sole market for the gas was a carbon black plant owned by United Carbon, at Ryus, Kansas, in Grant County. [P/TO ¶ 7(c)] In 1942, United Producing purchased the pipeline system, the contract providing for continued gas purchases by United Carbon, for its plant.

On March 12, 1948, United Producing Company, Inc., entered into a contract to sell gas to Cities Service Gas Co. [hereinafter called Cities] at 6½ cents per m. c. f. for the first five years, 7 cents per m. c. f. for the second five years, and the price to be redetermined each five year period thereafter, but not to be less than eight cents. No substantial sales were made at the contract price, for Cities had not completed its line to the Kansas City area, where it intended to resell gas. [P/TO ¶ 7(e)]

On February 18, 1949, effective March 1, 1949, the Kansas Corporation Commission fixed the minimum wellhead price at eight cents per m. c. f., measured at 16.4 pounds p. s. i. (Effective July 1, 1953, the pressure base was reduced to 14.65 pounds.) Later the Commission raised the minimum wellhead price to 11 cents per m. c. f., effective January 1, 1954. [P/TO ¶ 7(e) (f)] January 21, 1954, Cities wrote United Producing that it would comply with such order, on the understanding that if it were declared invalid, amounts paid in excess of the contract price would be refunded by United Producing. [P/TO Exh. 4] Prior to 1953, United Producing brought suit against Cities to recover gathering and transportation charges, because the Kansas minimum price order declared wellhead prices; this action was voluntarily dismissed, and no amounts were paid by Cities for gathering and transportation while the Kansas minimum price orders were in effect. [P/TO ¶ 7(i)]

In 1958, the United States Supreme Court held the Kansas Minimum Price Order unconstitutional and void; payment by Cities reverted to the price fixed by the 1948 contract, until August 22, 1958, when the parties agreed on a new wellhead price of eleven cents per m. c. f., effective October 1, 1958, and also a gathering and transportation charge of .88 cents per m. c. f. [P/TO Exh. 9] United Producing advised its royalty owners by letter of November 11, 1958, of the new wellhead price of 11 cents, but not of the .88 cent gathering and transportation charge provided under the new amendment. [P/TO Exh. 10]

Thereafter, Cities recovered judgment against United Producing for the amount it had paid under the invalidated Kansas Minimum Price Order, above the contract price, and United paid $1,550,-702.77 therefor. Neither United nor its successor, plaintiff herein, have sought to recover the overpayments from their royalty owners.

On March 23, 1961, United and Cities agreed to an increased price for gas, and an increased gathering and transportation charge, to be effective January 23, 1961. The wellhead price for gas was increased from 11 cents to 12 cents per m. c. f., and the gathering and transportation charge from .88 cents to 1.75 cents per m. c. f.

The 1958 increases have been approved by the Federal Power Commission. [P/TO Exh. 16] The 1961 increases, from 11 cents to 12 cents for gas, and from .88 cents to 1.75 cents for gathering and transportation, have neither been approved or disapproved. However, the FPC has permitted these increased rates to become effective, so that Cities has made payments accordingly. [P/TO Exhs. 17, 18] Ashland holds all receipts attributable to the one cent increase for gas, and the .88 cent increase for gathering and transportation in suspense. Pursuant to FPC requirements, United Producing and Ashland have executed and filed undertakings to refund any or all of the increase the FPC determines to be unjustified. [P/TO Exhs. 18, 19, 20], with interest at seven per cent per annum. Ashland carries the funds thus

subject to refund on its books as liabilities, but they are placed in the general account. Royalties on the amount of the yet-unapproved increases have not been paid, and are held in suspense, pending final FPC action. It is stipulated that Ashland complies with all applicable FPC orders and regulations regarding such funds.

An FPC proceeding is now pending, to determine the rates, retroactive to the 1961 amendments, by approval or disapproval of the increase or any part thereof. It is agreed that United Producing and Ashland, at all times pertinent, are "independent producers" and natural gas companies within the meaning of the Natural Gas Act, and that the FPC has "exclusive jurisdiction for setting rates and charges for gathering and transportation made by United and/or Ashland to Cities Service Gas Co * * *." [P/TO ¶ 7(n)] 15 U.S.C. § 717c.

Although all of the gas produced was dedicated to Cities, by agreement on November 29, 1948, Cities agreed to release part of the gas produced for sale to royalty owners for the operation of irrigation pumps, at the prices determined by the 1948 United-Cities gas purchase contract [P/TO Exh. 23] Accordingly, United Producing entered into agreements with its landowner-royalty owners for the sale of irrigation gas, purchasers including many of the original and intervening defendants herein. [See, e. g., P/TO Exhs. 24, 25, 26] Sales were at the wellhead price, and the gas is delivered in the immediate area of the wells from which it is produced. Royalties are paid on these sales, also.

After Staats circulated letters concerning royalties to Ashland's royalty-landowners, Ashland wrote its royalty owners, stating, inter alia, that it was paying royalty on the eleven cent price, that the added .88 cent gathering and transportation charge was just that, and not subject to royalty, and that royalties would be paid on the one cent gas price increase when and if approved by the FPC. [P/TO Exh. 27] Ashland has

continued to pay royalties only on the 11 cent price. In making payments, Ashland attaches to each check the amount of gas produced from each well, the fractional interest of the royalty owners, and the amount of the royalty. Irrigation gas sales, measured by a separate meter, are set out separately. All royalty owners, including original and intervening defendants, have continued to accept royalty payments to the present time. [P/TO ¶ 7(u)] Until circulation of the Staats' letter, no royalty owner had complained of the payments received. [P/TO ¶ 7(x)] It is stipulated that line losses and gains between the wellhead meters and the ultimate delivery point to Cities Service are absorbed by Ashland, and that on the average, line losses have exceeded gains substantially. The only cost studies of gathering and transportation herein, prepared for the pending FPC proceeding, disclose a cost substantially in excess of the charges set forth in the 1958 and 1961 agreements. [P/TO ¶ 7(z)] It is stipulated that the operation and maintenance of the 153-mile gathering system is supervised by Ashland's Santanta Field Office, and that the same office supervises production and maintenance of the wells, and reads the well meters.

It is stipulated that the highest price approved by the FPC for gas sold at the wellhead from gas wells of the age and formation and in the area in question has been eleven cents per m. c. f., regardless of the contract price, [P/TO ¶ 7 (aa)] and the value or price of gas on the market in interstate commerce is the price approved by the FPC. [P/TO ¶ 7(cc)]

Defendants contend, first, that royalty is payable on the gathering and transportation charge. They rely principally on two recent Kansas decisions, Schupbach v. Continental Oil Co., 193 Kan. 401, 394 P.2d 1, and Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602. In both cases, the court held costs for compressing casinghead gas which lacked sufficient pressure to enter the purchaser's line on the premises could

not be deducted from sums received for sale of gas, in computing royalties. In each case, the court found that such compression lay within the duty of making the gas marketable, and that the costs thereof could not be recovered, because they were necessary expenses incurred in the process of making such gas marketable. The court expressly did not consider the question herein. In Gilmore v. Superior Oil Co., supra, the court stated:

"The record discloses the gas here involved was put into pipelines already existing on the leases in question and we, therefore, need not consider that the lessee was put to any great expense in building miles of pipelines for that purpose." 192 Kan. at 393, 388 P.2d at 606.

We will not so enlarge the lessee's duty to market production so as to require it to devote a long and costly gathering system to transport gas to the nearest commercial market. The two state cases do not support such a holding and nowhere have we found the lessee's duty to market thus extended.

Defendants next argue that the gathering and transportation is in substance, if not in form, a royalty. They point out that the initial United Producing-Cities contract was silent on any gathering and transportation charge, and that royalty was paid on one eighth of what United Producing received from Cities. It is argued that, at the time of the price amendment in 1958, providing for a .88 cent gathering and transportation charge, Cities had purchased large volumes of gas through the system for ten years, and United Producing could reasonably be believed to have depreciated its investment in the system by that time. The inference that the .88 cents charge in the 1958 contract amendment is a royalty in disguise is unjustified, in our view. The costs of maintenance and operation are substantial continuing costs. It is agreed that the only cost studies made indicate that the gathering and transportation charges are substantially less than those provided by the 1958 and 1961 amendments. [P/TO ¶ 7(z)]

The charge is too well justified, at least ostensibly, to permit the inference defendants suggest. They further point out that the delivery point, to Cities, is at Ryus, Kansas, which is centrally located to all 119 wells. We do not understand this to have any bearing, on what United Producing or Cities intended, to impeach their labelling of the .88 cents, as such. So far as defendants' claims rest on these arguments, they must be rejected.

Plaintiff relies in important part on Kretni Dev. Co. v. Consolidated Oil Corp., 74 F.2d 497 (10th Cir. 1934), cert. denied, 295 U.S. 750, 55 S.Ct. 829, 79 L.Ed. 1694. The lessee developed gas production in commercial quantities from wells in the Ferris Field, in Wyoming. The only market was the Midwest Refining Co. plant 90 miles away. The lessee and Midwest executed a gas purchase contract, and an agreement whereby each paid half the cost of a pipeline to Midwest's plant, agreeing to share operating expenses. The contract provided a price of 4 cents per m. c. f. at the well, plus 8 cents per m. c. f. as a transportation charge. The transportation charge was later apportioned between the parties, but the 4 cents sale price of gas remained unchanged. The lease provided a gas royalty of "one-eighth part of the oil or as produced and saved from said premises for the proceeds derived from the sale of said one-eighth of said oil or gas." Plaintiff contended that the division of 4 cents for the gas and 7 cents for transportation was arbitrary, and that a fair division would have netted claimant more than 4 cents, for which recovery was sought. Judge Bratton wrote:

"The place at which the gas should be measured and its price fixed in case of sale is in a measure indefinite and ambiguous. The language 'or the proceeds derived from the sale of said one-eighth part of said oil or gas' must be construed from the context of the instrument, the circumstances attending its use, and the construction placed upon it by the parties. Pipe line fa-

cilities did not exist at the time the instrument was executed. The parties must have anticipated that transportation would be provided, but they certainly could not reasonably have contemplated that the lessee, either alone or in conjunction with another, would provide it to a far removed point of consumption and that they would share in the common ownership of the gas until it reached that destination and was sold there. The cost of transportation might equal or exceed the value of the gas in the field. The language and the circumstances in which it was used fail to indicate that the parties had such an eventuating situation in mind. * * * We think it is clear that the parties contemplated that the lessors or their assigns should be entitled to the royalty gas at the connection with the pipe line, or the proceeds from its sale at that point. * * * That is the only reasonable construction which the provision contained in the operating lease will bear and renders its two features symmetrical. Provisions identical in effect have been so construed in similar circumstances. Scott v. Steinberger, 113 Kan. 67, 213 P. 646". [Other authorities omitted.] 74 F.2d at 499.

(The "two features" the court thus found symmetrical includes the provision of the lease that if the royalty is paid in kind, delivery would be at the well.)

The court further stated:

"It may be conceded for the purpose of this case that a lessee is obligated to put forward a reasonable effort to market gas produced on the leased premises, but certainly that duty does not extend to the point of providing pipe line facilities ninety miles in length at a large outlay of money with an attending financial hazard due to possible exhaustion of the supply and other frequently encountered factors, in order to reach a market at which the product may be sold." 74 F.2d at 500.

In short, the court found from the "context of the instrument, the circumstances attending its use, and the construction placed upon it by the parties," that the parties contemplated and intended that gas be measured and its price fixed in case of sale at the wellhead.

A like approach was followed in Scott v. Steinberger, 113 Kan. 67, 213 P. 646 (1923), cited in *Kretni*, supra. The issue was whether plaintiff lessee was entitled to the value of gas at the well, or the price at which it was sold at the end of a pipeline built by defendants, for over $61,000, after execution of the lease and production in paying quantities. The trial court found 8 cents a reasonable value of the gas on the premises, and 7 cents a proper transportation charge, to the marketing point. The gas royalty was "one-eighth of all gas produced and marketed." The court stated that "the rights of the parties here are to be determined by the provisions of the lease, and we think the reasonable interpretation of the lease is that the lessor's share of the gas was to be ascertained and the price determined at the pipe line with which the wells were connected." 113 Kan. at 69, 213 P. at 647. Plaintiff was entitled to "one-eighth of the gas introduced in the pipes without having it diminished by the leakage in transportation through the pipes."

■ Likewise, in this case, we hold that the duty to market gas does not require Ashland to devote its pipeline, even though existing at the time part of the leases were executed, to gather and transport gas from lessors' property to the purchaser's pipeline. The system represented a large investment, and its use involves substantial operating and maintenance outlays.

■ Accordingly, the rights of the parties herein are to be determined by the leases. Plaintiff asks the court to take judicial notice that it was the established practice and custom in the gas production industry and in the Hugoton Field to measure, determine the price, and pay gas royalty at the wellhead on

gas produced. The court may take judicial notice of a general trade usage. United States v. Stanolind Crude Oil Purchasing Co., 113 F.2d 194 (10th Cir. 1940). However, whether such is the established custom and practice is the single disputed factual issue herein. [P/TO ¶ 10] Such custom was found to exist by the trial court in Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576, 73 A.L.R.2d 1045 (1958), but not, apparently, by judicial notice. This disputed factual issue is material, only if it is assumed that the lessors executed the leases herein with reference to such a custom, and placed that construction on the language.

The gas royalty clauses are set out in Exhibit 48, to the Pre-Trial Order, and they read as follows:

A. "The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (⅛) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (⅛) of its market value at the well * * *."

B. "To pay the lessor the equal one-eighth (⅛) of the net proceeds, * * *."

C. "One-eighth (⅛) of the proceeds of sale thereof, or one eighth (⅛) of the proceeds of the sale of gas, as such."

D. "One-eighth of the proceeds from the sale of gas as such at the mouth the well."

E. "To pay to the lessor the equal one-eighth of the gross proceeds * * * for the gas from any * * * well where gas only is found, while the same is being used off premises * * *."

F. "One-eighth of the gross proceeds at the prevailing market rate for all gas used off the premises."

Clauses A and D clearly contemplate sale at the well; they are unambiguous on that point. The remaining four clauses require payment of royalties from the "proceeds" or "gross proceeds." The

point of sale from which these proceeds are derived is not stated.

Plaintiff cites a number of cases which hold that, absent an express contrary provision, the gas royalty is payable on the wellhead market price, and not on the price received after transportation to another site. See Warfield Natural Gas Co. v. Allen, 261 Ky. 840, 88 S.W.2d 989 (1935); Rains v. Kentucky Oil Co., 200 Ky. 480, 255 S.W. 121 (1923); Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103 (1937); Sartor v. United Carbon Co., 183 La. 287, 163 So. 103 (1935).

The Kentucky cases were reviewed in LaFitte Co. v. United Fuel Gas Co., 284 F.2d 845 (6th Cir. 1960). The lease provided a one-eighth royalty on the "gross income received by the lessee from the sale or disposition in whatever manner and for each and every purpose, of gas produced and sold or marketed in its natural or reduced state from demised premises." The court found that the lease did not sufficiently describe a point of sale other than the wellhead, to preclude application of the rule announced Warfield Natural Gas Co. v. Allen, supra, and Rains v. Kentucky Oil Co., supra. Thus, in effect, these cases state that a presumption exists that the wellhead is the point of sale and delivery at which point the royalty is to be computed, absent an express stipulation to the contrary. Such a rule has not been announced by the Kansas courts, in express terms, and we do not choose to adopt such a rule of construction.

We conclude, from "the context of the instrument, the circumstances attending its use, and the construction placed upon it by the parties," that the proceeds to which the lessors' royalties attach are the proceeds derived from the sale of gas at the well. The royalties paid under these leases were and are computed on the metered gas at the well, and not at the point where the gathering system meets Cities' pipeline. Line losses which exceed gains [P/TO ¶ 7(w)] have been borne by Ashland.

When at least part of the leases were executed, the purchaser was United Carbon, for its plant at Ryus, Kansas. No charge for gathering and transportation was made then, because the purchaser owned the system. The gas passed to the purchaser at the well-side entrance to the system, and proceeds obviously derived from the sale at that point. Under defendant's contention, when United Producing purchased the system in 1942, the point of sale automatically shifted to the opposite end of the system, to the plant at Ryus, and the term "proceeds" in all subsequent leases referred to sales made at that point. Yet, the parties' conduct does not conform to that theory, for so far as appears, the meter readings upon which royalties are based have always been made at the well, with no attribution of line gains or losses to lessors. Purchases of gas for irrigation purchases were made by agreement between lessors and United Producers. Lessors expressly purchased such gas from the well, and paid wellhead price equal to that paid by Cities, either 11 or 12 cents. Lessors who purchased such gas received royalties on the "proceeds" of these sales at the wellhead, precisely as they received royalties on sales to Cities.

■ Further, the royalties are to be paid from "proceeds" from the sale of gas. Disregarding the point of sale at which such proceeds are to be computed, we cannot recharacterize the .88 cent gathering and transportation charge as proceeds from the *sale* of gas. It is stipulated that the highest price approved by the FPC for gas sold at the wellhead from wells of the age and from the formation and in the area in question has been 11 cents per m. c. f., regardless of the contract price, and no higher. [P/TO Exh. ¶ 7(aa)] There can be no question but that as between United, and its successor, Ashland, and the purchaser, Cities, the .88 cents and the 1.75 cents represent bona fide transportation charges; they are not royalties in a different guise. Royalties arise only from proceeds for the *sale of gas*. Ashland did not receive these charges as

consideration for the sale of gas. There is no question but that such charges are bona fide payments for the use of an extensive and valuable gathering system. Such sums are not, thus, subject to royalty payments, regardless of where the gas is delivered, or what the parties contemplated under the language of the leases.

Even if we were to assume that the parties contemplated that royalty would be paid on the proceeds from sale at the market price at the end of the gathering system, there is still no basis for recharacterizing a bona fide transportation charge paid to Ashland, as consideration for the sale of gas itself.

■ We hold that the reasonable interpretation of the language of the contract, as guided by the conduct of the parties, requires the conclusion that royalty is not payable on the gathering and transportation charges. We hold, further, that such charges are not "proceeds" from the sale of gas, upon which royalties are payable. We need not reach plaintiff's claim that the defendants' claims are foreclosed by accord and satisfaction.

Defendants next assert that they are entitled to payment now of royalties on the one-cent increase in the natural gas price now collected by Ashland, but as yet neither approved nor disapproved by the FPC. This increase was agreed upon by United Producing and Cities on March 23, 1961, to be effective June 23, 1961. [P/TO ¶ 7(m), Exh. 12] These amended rates were filed with the Commission with a letter dated March 28, 1961 [P/TO, Exh. 14] They have neither been approved nor disapproved, but the Commission has permitted them to become effective, subject to refund with interest at 7% per annum, of any part or all of the increase finally determined to be unjustified. [P/TO Exh. 17] Ashland carries all income attributable to the increase as liabilities on its books, although the funds are not held in a separate account. It is stipulated that Ashland complies in all

respects with applicable FPC orders and regulations regarding such funds.

We do not understand the ground upon which defendants base their claim to immediate payment of royalties, other than that the sums attributable to the unapproved increase constitute "proceeds" from the sale of gas.

■■ Defendants' right to royalties from those receipts can be no greater than the lessee's right to the monies from which those royalties derive. Ashland has no final enforceable right to these funds, for they have not been approved, and may be rescinded. Plaintiff holds them subject to refund, and are responsible for any refund which may be ordered. We perceive no ground on which Ashland should be compelled to pay out sums, for the refund of which it may be liable, and as to which its own right is not finally determined, to royalty owners whose own right to royalties from those funds will be finally determined only when Ashland's own right is determined.

Section 4(a) of the Natural Gas Act, 15 U.S.C. § 717c(a), provides that all rates and charges made, demanded or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission shall be "just and reasonable," and "any such rate or charge that is not just and reasonable is declared to be unlawful." Plaintiff states that it has chosen to collect the higher rate subject to refund if it is disapproved, because increases not made effective subject to approval cannot be made retroactive. See 15 U.S. C. § 717c(a). Plaintiff further points out that this is the only way the royalty owners can possibly receive royalty on the increases agreed to in 1961. If Ashland were required to pay over funds which it now holds, and a refund of all or any part thereof were subsequently ordered, it would have to demand repayments from a large number of royalty owners, and risk the necessity of a multiplicity of legal actions. Ashland has taken a course designed and intended best to serve the interests of the royalty owners and of itself. As a result, it holds the sums sought in what is roughly analogous to a fiduciary capacity. In our view, plaintiff has stated no right to recover royalties on these funds, when it is not yet finally determined that they represent lawful proceeds from the sale of gas.

The parties agree that J. M. Huber Corp. v. Denman, 367 F.2d 104 (5th Cir. 1966) does not apply to the facts here, and it is unnecessary, therefore, to comment thereon.

Plaintiff's motion for summary judgment is granted. Prevailing counsel will prepare, circulate and submit an appropriate judgment.