

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN, TEXAS 78711

CRAWFORD C. MARTIN
ATTORNEY GENERAL

August 23, 1971 *Overruler WW. 196,*
*in Part*

Honorable Bob Armstrong
Commissioner
General Land Office
Austin, Texas   78701

Dear Commissioner Armstrong:

Opinion No. M-943

Re:   Whether a proportionate
      cost of preparing natural
      gas from State leases for
      market may legally be
      deducted from the State's
      royalty interest.

        Your request sets out the following facts.  The lease
operator holds several State oil and gas leases in the Gulf
of Mexico upon each of which it has drilled several wells
that produce natural gas.  On each lease one of the wells is
a platform well or production deck well upon which are heaters,
gas production separators, dehydrators, and metering devices
for gas, condensate, and water.  Each lease also contains one
or more satellite wells upon which are a heater, meter, regu-
lator, valves, and flow lines running from the satellite well
to the platform well.  After the gas has been processed through
the above mentioned facilities, it is sold by the operator
to the gas gatherer-purchaser at the platform well.

        You further state that the lease operator seeks to
deduct from and thus charge against the State's 1/6th royalty
a proportionate part of the amortization of the costs of the
above mentioned facilities, a 6% return on the investment,
and the costs of operating these facilities.

        Against this background you specifically request
that this office ". . . review Opinion No. WW-196, along with
our past and current oil and gas lease forms and advise us
whether the charges asked for by the companies can be legally
justified."

        The statutory authority pursuant to which the royalty
provision of the State oil and gas lease in question must
conform is Sec. 8 and Sec. 10 of Art. 5421c, Vernon's Civil
Statutes.  Section 8 reads in part:

        "All islands, salt water lakes, . . . and
        that portion of the Gulf of Mexico within

-4612-

the jurisdiction of Texas . . . shall
be subject to lease by the Commissioner
of the General Land Office . . ., in
accordance with the provisions of all
existing laws pertaining to the leasing
of such areas of oil and gas; . . . ;
provided further, that the royalty
reserved to the state shall be not less
than one-eighth (1/8) of the gross pro-
duction or value of oil, gas and sulphur.
. . ." (Emphasis added)

Section 10 reads in part:

"The areas included herein shall be leased
for a consideration, in addition to the
cash amount bid therefor, of not less than
one-eighth (1/8) of the gross production of
oil, or the value of same, that may be pro-
duced and saved, and not less than one-
eighth (1/8) of the gross production of gas,
or the value of same, and not less than one-
eighth (1/8) of the gross production of
sulphur, or the value of same that may be
produced, that may be produced and sold off
the area, and not less than one-sixteenth
(1/16) of the value of all other minerals
that may be produced, and an additional
sum of twenty-five cents an acre per year
for each year thereafter until production
is secured. . . ."

The gas royalty provision contained in the State lease in
question reads as follows:

"3. When production of oil and/or gas
is secured, the Lessee agrees to pay or
cause to be paid to the Commissioner of
the General Land Office at Austin, Texas,
for the use and benefit of the State of
Texas, during the term hereof; . . .
(B) As royalty on any gas, . . . produced
from any well and sold by Lessee, or used
by Lessee for purposes which are not
exempted from royalty payments . . . (1/6)
of the value of the gross production, but
in no event shall the royalty be based on a
price of less than the highest market price

paid or offered for gas in the general area,
or the price paid or offered to the producer,
whichever is the greater; . . ." (Emphasis
added)

Analysis of the statutes and the State lease is light of the
case law and former opinions of this office dealing with
these leases and statutes provides the basis for the re-
examination of Opinion WW-196.

Sections 8 and 10 of Art. 5421c, were originally
promulgated by Acts 1931, 42nd Leg., p. 452, ch. 271. Sec.
10 has remained unchanged to date, but Sec. 8 has been amended
several times, the most recent and important being by Acts
1957, 55th Leg., p. 434, ch. 209, §1, effective May 10, 1957,
which added the proviso underlined in the above quoted portion
of Sec. 8. In addition, Acts 1957, supra, stated that "All
laws or parts of laws in conflict herewith are expressly
repealed." Therefore, Sec. 8, on and after May 10, 1957, is
the statutory authority for the clause in the State lease
specifying the royalty reservation to the State. Prior to
this amendment, however, Sec. 10 was the controlling statutory
provision insofar as the royalty reservation clause in the
State lease is concerned.

Comparison of the Sec. 8 royalty provision with that
contained in Sec. 10 leads us to the conclusion that a material
change was effected with respect to royalties on oil and sul-
phur. In effect, by the 1957 amendment, Sec. 8 deleted from
Sec. 10 the qualifying language ". . . that may be produced
and saved, . . ." as this pertains to the royalty payable on
oil and the language ". . . that may be produced, that may be
produced and sold off the area, . . ." as this pertains to
sulphur. However, the absence of such modifying language in
Sec. 10 and Sec. 8 in regard to the royalty provision per-
taining to gas demonstrates a distinguishably consistent
statutory standard. The various gas royalty reservations,
i.e., that ". . . gross production of gas, or the value of
same. . ." as used in Sec. 10 of Art. 5421c, and ". . . gross
production or value of . . . gas . . ." used in Sec. 8 of
Art. 5421c, and ". . . value of gross production . . ." used
on the State lease form, are synonomus in meaning. We are
of the opinion that with respect to gas, the State must receive
its fractional interest based on the value of the entire
production of gas without any deductions from the gas volume
produced (Attorney General Opinion V-475) (1948), or the value
thereof. In this we are fully supported by the authorities
and the language of the State lease, as will be pointed out below.

We are supported by way of analogy with Article 5368, Vernon's Civil Statutes, commonly referred to as the Relinquishment Act, which specifies, in part, that:

> ". . . No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty . . . and in case of production shall pay to the State the undivided one-sixteenth of the value of the oil and gas reserved herein, and like amounts to the owner of the soil." (Emphasis added)

This language was construed in the case of Greene vs. Robison, 117 Tex. 516, 8 S.W.2d 655, 660 (1928), to mean:

> ". . . We interpret the Act to fix a minimum price of 10 cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, for which the state is willing to sell the oil and gas, . . ." (Emphasis added)

It is our opinion, and we are supported by Attorney General's Opinion O-6398 (1945), that within the phrase "the value of one-sixteenth of the gross production free of cost . . .," the term "free of cost" must be given the same meaning as the term "free royalty" used in Sec. 4, Art. 5421c, and defined in the case of Wintermann vs. McDonald, 129 Tex. 275, 102 S.W.2d 167, 173 (1937), that is:

> ". . . The term 'free royalty' introduced into this Act must mean that the interest reserved to the State in the minerals produced on school land sold under the terms of the Act must not bear any part of the expense of the production, sale, or delivery thereof." (Emphasis added)

We do not recognize any material distinction between the language delineating the basis for gas royalty to the State used in Sec. 8 and Sec. 10, Art. 5421c, and the language of Art. 5368, previously construed by the Court. Our conclusion is that the phrase in Sec. 8, Art. 5421c, to the effect that ". . . the royalty reserved to the state shall be not less than one-eighth (1/8) of the gross production or value of oil, gas and sulphur . . ." must be construed to mean that the royalty

interest of the State must not bear any part of the expense
of the production, sale or delivery of production of gas, and
oil and sulphur for that matter, from a State lease.  The
State lease conforms to the statutory language and, therefore,
is to be given the same meaning and effect.

In the case of California Company vs. Udall, 296 F.2d
384, (D.C.Cir. 1961), the Court had before it a statute and
lease issued under the Mineral Leasing Act, Sec. 17, Mineral
Leasing Act as amended, 41 Stat. 443 (1920), as amended,
60 Stat. 951 (1946), 30 USCA §226(c).  The statute provides,
in part, that the:

>"Leases shall be conditioned upon the
>payment by the lessee of a royalty of
>12-1/2 per centum in amount or value
>of the production removed or sold from
>the lease."

The question before the Court was whether certain cost of
conditioning the gas for market were chargeable to the lessor's
royalty interest.  The Court sustained as reasonable the
Secretary of Interior's decision that "production" was the
product [gas] in marketable condition as well as sustaining
the premise of his decision that ". . . since the lessee was
obliged to market the product, he was obligated to put it in
marketable condition; . . .".  Relevant to our analysis of
the State lease in question here is the fact that the Secretary
of the Interior had promulgated pursuant to the statutory language
quoted above the following regulations governing leasing:

>"221.47  Value basis for computing
>royalties.  The value of production, for
>the purpose of computing royalty shall be
>the estimated reasonable value of the
>product . . . .  Under no circumstances
>shall the value of production. . . be
>deemed to be less than the gross proceeds
>accruing to the lessee from the sale
>[of the product]."  30 C.F.R. §221.47
>(1959); and

>"221.35  Waste prevention; beneficial use.
>The lessee is obligated to prevent the
>waste of oil or gas and to avoid physical
>waste of gas the lessee shall consume it
>beneficially or market it or return it to

the productive formation."   30 C.F.R.
§221.35 (1959)

The latter part of the first regulation reads essentially the
same as the phrase following "value of gross production" in
the State lease form, that is:

> "but in no event shall the royalty be
> based on a price of less than the highest
> market price paid or offered for gas in
> the general area, or the price paid or
> offered to the producer, whichever is the
> greater; . . ."

The second regulation reads essentially the same as the first
sentence in provisions 3(F) in the State lease form.  Section
3(F) reads as follows:

> "Lessee agrees to use reasonable diligence
> to prevent the underground or above ground
> waste of oil or gas, and to avoid the
> physical waste of gas produced from the
> leased premises, Lessee shall either mar-
> ket said gas or use same beneficially in
> operations on the leased premises."

It is our opinion that California Company vs. Udall,
supra, clearly sustains our position that the lessee-producer
of gas from a State lease, pursuant to the terms of the lease,
must pay royalties without any deductions for the cost of
producing, sale or delivery of the gas so produced.  The same
result was reached in Gilmore vs. Superior Oil Co., 192 Kan.
388, 388 P.2d 602.; Skaggs vs. Heard, 172 F.Supp.  813 (S.D.Tex.
1959); California Company vs. Seaton, 187 F.Supp. 445 (D.D.C.
1960).

Our position is further supported in principle by
Pan American Petroleum Corporation vs. Southland Royalty Co.,
396 S.W.2d 519 (Tex.Civ.App. 1965, error dism.), where on page
524 the Court said:

> "It has long been established that a royalty
> interest is one that is free of cost of
> producing,  saving and preparing the product
> for market.  Miller vs. Speed, Tex.Civ.App.
> 248 S.W.2d 250 (n.w.h.)"

To the same effect, Merrill, Covenants Implied in Oil and Gas

Leases (Second Edition), Section 85, Page 214, states that:

> "If it is the lessee's obligation to market
> the product, it seems necessarily to follow
> that his is the task also to prepare it for
> market, if it is unmerchantable in its
> natural form. No part of the cost of mar-
> keting or of preparation for sale is charge-
> able to the lessor. This is supported by the
> general current of authority."

Attorney General's Opinion WW-196 (1957) specifically deals with the fact situation where the gas must be transported some considerable distance from the leased premises by the lessee in order to sell the gas to a pipeline purchaser. To that extent, Opinion WW-196 is distinguishable from the present situation on the facts and we do not reconsider that portion of the Opinion. However, in all other regards, Opinion WW-196 is expressly overruled because it is based on an erroneous interpretation of Sec. 10, Art. 5421c, with respect to gas processing charges and after May 10, 1957, it is no longer the controlling statute delineating the mineral reservation to the State. In addition, the rationale and authorities cited in that opinion are generally in point where the lease in question provides that royalties are to be based upon the value of gas at the wellhead and are distinguishable from and not definitive of the applicable statutory language of Sec. 8, Art. 5421c, used in the State lease. This distinction is material as is pointed out by Skaggs vs. Heard, supra, at page 816:

> "Plaintiff concedes the general rule
> that, where a lease provides for royalty
> on gas marketed or utilized by the les-
> see, there is an implied obligation upon
> the lessee to use reasonable diligence
> in marketing the gas[7] but says that this
> does not mean that the lessee is to pay
> all of the costs or expenses of market-
> ing, transporting, processing or treat-
> ing the gas, citing numerous cases where
> gas was not sold at the well or on the
> lease but was carried a great distance
> to market[8] or was enhanced in value by
> processing into by-products in expensive
> plants,[9] or both,[10] or depending on pro-
> visions altogether different from those
> used here.[11] Many other cases are cited

and discussed by counsel on both sides. All are distinguishable on one or the other of the grounds noted above.

---

7

Cole Petroleum Co. v. United States Gas & Oil Co., 121 Tex. 59, 41 S.W.2d 414, 86 A.L.R. 719; Masterson vs. Amarillo Oil Co, Tex.Civ.App., 253 S.W. 908; 11 Tex.Law Review 401-438.

8

Kretni Development Co. v. Consolidated Oil Corp., 10 Cir., 74 F.2d 497, (where a pipe line was laid 90 miles by the lessee); Scott v. Steinberger, 113 Kan. 67, 213 P. 646; Robert v. Swanson, Tex. Civ.App., 222 S.W.2d 707.

9

Danciger Oil & Refineries, Inc. v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321; Le Cuno Oil Co. v. Smith, Tex.Civ. App., 306 S.W.2d 190.

10

Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576.

11

Cf. Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185, calling for 1/8th of the net proceeds derived from gas at the mouth of the well."

The lease in question clearly provides that the basis on which the royalty to the State must be paid can in no event be less than the greater of the price offered to or received by the producer or the highest market price paid or offered for gas in the general area. Generally, the royalty to the State will be based upon the price for gas received by the producer at the point where the producer delivers the gas to the pipeline purchaser. Nothing in the language of the lease contemplates any deductions for gathering, compression or dehydrating the gas by the lessee-producer from the price he receives before computing the State's royalty interest.

Consideration of provision 4 in the State lease form governing the manner and form of payment of royalty to the State further supports our position.  The provision reads as follows:

> "4.   All royalties shall be paid to the Commissioner of the General Land Office at Austin, Texas, during the life of this lease, on or before the 30th day of each succeeding month, for the month in which the oil and/or gas was produced, and shall be accompanied by a sworn statement of the owner, manager, or other authorized agent, showing the gross amount of oil produced since the last report, and the amount of all dry gas, residue gas, casinghead gas, and other products produced therefrom, sold or used for the manufacture of gasoline, and the market value of the oil, dry gas, residue gas, casinghead gas, and other products produced therefrom, together with a copy of all daily gauges of tanks, meter readings, pipeline receipts, gas line receipts and other checks and memoranda of the amounts produced and put into pipelines, tanks or pools and gas lines or gas storage. In all cases the authority of a manager or agent to act for the Lessee herein must be filed in the General Land Office."

Relevant to the question here, we note that while this provision requires a sworn statement to be submitted detailing the volume and market value of the dry gas produced, sold or used and put into pipelines, tanks or pools and gas lines or gas storage, it does not provide for an accounting of any producing, processing, transporting or marketing charges.  Common sense dictates that were it contemplated that the pro rata share of these charges would be deductible from the royalty interest of the State, such charges would be specifically required as part of the sworn statement referred to in provision 4.

## SUMMARY

The lessee or operator of a natural gas well located on a State tract may not legally deduct from the royalty due the State a pro rata portion of the cost of

production, gathering, compression, dehydration, sale or delivery of the natural gas produced on the State tract. Attorney General Opinion No. WW-196 (1957) is overruled to the extent necessary to conform with this opinion.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by:
J. Milton Richardson
Linward Shivers
Rex H. White, Jr.
Assistant Attorneys General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
W. E. Allen, Co-Chairman

James H. Quick
Harold G. Kennedy
Houghton Brownlee, Jr.
W. O. Shultz

MEADE F. GRIFFIN
Staff Legal Assistant

ALFRED WALKER
Executive Assistant

NOLA WHITE
First Assistant